**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| UNITED STATES of AMERICA, | : | |
| | : | |
| | : | CIVIL ACTION NO. |
| | : | 1:04-CR-0424-RWS |
| v. | : | |
| | : | |
| WILLIAM C. CAMPBELL, | : | |
| | : | |
| Defendant. | : | |

## <u>ORDER</u>

Presently submitted to the Court for review are Defendant's Motion to
Dismiss Indictment for Pre-Indictment Delay [45], the Magistrate Judge's
Report and Recommendation [151] recommending the denial of that Motion,
and Defendant's Objections to that Report and Recommendation [168];
Defendant's Motion to Dismiss All Counts of the Indictment as Duplicitous [46]
and the Magistrate Judge's Report and Recommendation [170] recommending
that the Motion be denied; and Defendant's Objections to the Magistrate's
Order Denying his Motion to Disqualify First Assistant United States Attorney

AO 72A
(Rev.8/82)

Sally Yates [165].  In addition, the Court, at an August 15, 2005 hearing, indicated that it would review certain purportedly privileged documents produced to the Government by counsel for a potential trial witness, and determine whether any privilege that would have otherwise attached to those documents has been waived by virtue of such (seemingly inadvertent) production.  After its review of the record, the Court addresses each of these issues below.

**Background**

Defendant, the former Mayor of the City of Atlanta, is charged in a seven count indictment with RICO violations, bribery, and tax fraud.  Count One charges that from at least 1996 through January 2002, while Defendant served as Mayor, he conducted the City's affairs through a pattern of racketeering activity involving eleven racketeering acts in violation of 18 U.S.C. § 1962(c).  Specifically, Racketeering Acts 1 through 3 charge Defendant with soliciting and accepting over $50,000 in cash payments during 1999 from certain computer contractors in connection with a contract to prepare the City's computers for "Y2K."  (Indictment, Count One, ¶¶ 7-34).  Racketeering Acts 4 and 5 charge Defendant with participating in a scheme to defraud the citizens of Atlanta of his

2

honest services by soliciting and accepting payments and other benefits, directly and indirectly, from individuals and businesses engaged in or seeking to do business with the City from 1996 through at least 1999. (Id. at ¶¶ 35-67). Racketeering Acts 6 and 7 charge that, between 1996 and 1998, Defendant used an individual he employed as his Special Assistant to collect payments from a club owner seeking liquor licenses from the City and a communications contractor doing business with the City. (Id. at ¶¶ 68-97). Racketeering Acts 8 through 10 charge that, from about 1997 through 2002, Defendant participated in a scheme and artifice to defraud the citizens of Atlanta of his honest services by causing, encouraging, soliciting, and accepting illegal campaign contributions, and defrauding contributors to and creditors of his re-election campaign. (Id. at ¶¶ 98-127). Racketeering Act 11 charges Defendant with honest services fraud by soliciting and accepting undisclosed financial benefits from a water company engaged in and seeking to do business with the City. (Id. at ¶¶ 128-143).

Counts Two through Four of the Indictment charge Defendant with taking corrupt payments in violation of 18 U.S.C. § 666, from certain computer contractors, as alleged in Racketeering Acts 1 through 3. Counts Five through

Seven charge Defendant with willfully filing false tax returns for tax years 1997, 1998 and 1998 by under-reporting material amounts of income he received during those years.

**Discussion**

**I.      Dismissal for Pre-Indictment Delay**

Defendant has moved the Court to dismiss Count One of the Indictment, the RICO charge, or in the alternative, to strike Racketeering Acts 8 and 9 due to pre-indictment delay.  Racketeering Acts 8 and 9 allege that the Defendant directly and indirectly solicited illegal campaign contributions from individuals whose companies were seeking to do business with the City of Atlanta.  (Id. at ¶¶ 98-121).  Racketeering Act 8 charges honest services mail fraud based on Defendant's interactions with a "Development Contractor" who was seeking to sell a substantial amount of dirt to the City for the fifth runway expansion at the Hartsfield-Jackson International Airport.  In particular, it alleges that he solicited the Development Contractor to raise $100,000 for his re-election campaign in approximately two weeks in November 1997 between the general election and the runoff.  (Id. at ¶¶ 100-115).  The indictment alleges that Defendant told the Development Contractor that there was nothing Defendant could do to help him

4

were he not re-elected, and as a result of Defendant's request, the Development

Contractor funded over $86,000 in illegal campaign contributions to

Defendant's campaign via "straw donors" and through an individual referred to

in the indictment as the "Testing Contractor."  (Id. at ¶¶ 108-112).  Defendant

identifies this Testing Contractor as Ricky Rowe.

Racketeering Act 9, which charges a violation of the state bribery statute,

involves another solicitation of $100,000 in illegal campaign contributions for

Defendant from an individual whose Management Firm was pursuing a City

contract to remedy a problem with sewer overflows polluting the Chattahoochee

River. (Id. at ¶¶ 116-121).  The indictment alleges that in August 1997, after the

Management Firm representative was unable to obtain a meeting with Defendant,

the Management Firm representative was introduced to Mr. Rowe as someone

who could get him access to Defendant.  (Id. at ¶ 118).  Mr. Rowe, according

to the indictment, promptly arranged a meeting for the Management Firm

representative with Defendant, and at the conclusion of that meeting, Defendant

asked to speak with Mr. Rowe privately.  The indictment states that when Rowe

emerged from his private meeting with Defendant, the Management Firm

representative asked what they needed to do to move forward on the proposal.

AO 72A
(Rev.8/82)

After he directed the Management Firm representative outside, Mr. Rowe allegedly said, "I'm not saying the Mayor said this, but $100,000 by the end of the month to the Mayor's campaign and the contract is yours whether he wins the election or not." (Id. at ¶ 119). The Management Firm decided not to pursue the project with the City under those circumstances. (Id. at ¶ 120). Mr. Rowe died in the seven years between these alleged acts and the issuance of the instant indictment.

Defendant moved to dismiss Count One of the indictment, or to dismiss Racketeering Acts 8 and 9, due to Mr. Rowe's death and the prejudice he contends he suffered as a consequence. It is Defendant's position that, had Mr. Rowe lived, he would have provided testimony exculpating Defendant at trial. Moreover, Defendant asserts that the Government deliberately elected to delay seeking the indictment against him to gain a tactical advantage in his prosecution.

The Government opposed Defendant's motion, and on August 4, 2005, Magistrate Judge E. Clayton Scofield III issued a Report and Recommendation [151] (the "August 2005 Report") recommending that the Defendant's Motion to Dismiss be denied. Defendant objects to the August 2005 Report, and in

6

particular, the Magistrate's conclusion that he suffered no actual, substantial

prejudice as a result of Mr. Rowe's death.  In light of this objection, the Court

reviews the Magistrate's decision *de novo*.  See United States v. Hale, 934 F.

Supp. 427, 428 (N.D. Ga. 1996) ("When a party files timely and specific

objections to findings of fact made by a magistrate judge, the district court is

obligated to conduct a *de novo* review of the record regarding that issue.").

### A.    Applicable Law

"The limit on pre-indictment delay is usually set by the statute of

limitations."  United States v. Foxman, 87 F.3d 1220, 1222 (11th Cir. 1996).

That said, "the Due Process Clause can bar an indictment even when the

indictment is brought within the limitations period."  Id.; see also United States

v. Lovasco, 431 U.S. 783, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977); United

States v. Marion, 404 U.S. 307, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971).

In order to obtain dismissal of an indictment on grounds of delay, a

defendant must make a two-part showing.  First, he must demonstrate that the

delay caused him to suffer "actual substantial prejudice."  Foxman, 87 F.3d at

1222.  "Prejudice is demonstrated when the defendant has been 'meaningfully

impaired in his ability to defend against the [government's] charges to such an

7

extent that the disposition of the criminal proceeding was likely affected.'"

United States v. McKoy, 129 Fed. Appx. 815, 819 (4th Cir. 2005).  "[T]o carry

the heavy burden of proving actual prejudice from pre-indictment delay,

concrete proof is required; mere speculation and bare allegations will not

suffice."  United States v. McCoy, 977 F.2d 706, 711 (1st Cir. 1992); see also

United States v. Corbin, 734 F. 2d 643, 648 (11th Cir. 1984) (assertion that

several prospective witnesses died, without more, fails to establish requisite

prejudice); McKoy, 129 Fed. Appx. at 819 (defendant must demonstrate

prejudice with some degree of specificity).[1]

      Second, the defendant must show that "the delay was the product of a

_____

[1]The Government asks the Court to read the "actual substantial prejudice" requirement to include an obligation on the part of the defendant to show that the evidence or testimony lost by the delay would have withstood cross-examination, citing decisions by the Seventh Circuit in Pharm v. Hatcher, 984 F.2d 783, 787 (7th Cir. 1993); United States v. Doerr, 886 F.2d 944, 964 (7th Cir. 1989).  Without deciding whether perceived deficiencies in the credibility of certain testimony or evidence should *ever* enter the Due Process analysis, the Court declines the Government's invitation here.  The Eleventh Circuit has not indicated such an evaluation is appropriate, and its reasoning in at least one case militates against such a formulation of the prejudice concept.  See United States v. Mills, 704 F.2d 1553, 1557 (11th Cir. 1983) (finding "genuinely prejudicial" prison murder defendant's lack of access to testimony of deceased fellow inmate who confessed to crime, notwithstanding fact that deceased inmate's "description of the details of the murder was factually incorrect, but identical to the erroneous report in the Atlanta newspaper" and that prison psychiatrist and psychologist testified that deceased inmate "would have been incapable of [the] murder but was fully capable of falsely confessing to it in order to ingratiate himself" with prison gang).

deliberate act by the government designed to gain a tactical advantage."

Foxman, 87 F.3d at 1222; see also Lovasco, 431 U.S. at 790 ("proof of

prejudice is generally a necessary but not sufficient element of a due process

claim").  Such a showing need not comprise evidence that the Government

delayed for the purpose of causing the relevant prejudice or had some other

"sinister motive" in failing to more expeditiously pursue an indictment.  Foxman,

87 F.3d at 1223 n.2.  Rather, "[t]he critical element is that the government makes

a judgment about how it can best proceed with litigation to gain an advantage

over the defendant and, as result of that judgment, an indictment is delayed."

Id.

        Only if a defendant is able to prove both such tactical maneuvering and

actual substantial prejudice will due process have been offended.  Corbin, 734

F.2d at 647-48 ("We need not reach the question of whether the delay was

intended to gain tactical advantage, because the defendants have made no

showing that they were prejudiced by the delay.").

### B.    Pertinent Factual Background

        In March 2000, relatively early in the Government's investigation into

Atlanta City Hall, the FBI interviewed Mr. Rowe.  (See Tr. of May 18, 2005

9

Hr'g at 56-57, 66.)  During that interview, Mr. Rowe denied any wrongdoing in

connection with his contractual dealings with City Hall.  (Id. at 66.)  Although he

acknowledged raising a substantial amount of money for Defendant's

campaigns, he stated that he had not witnessed anyone giving money to

Defendant "apart from campaign contributions."  (Id.)  Mr. Rowe opined,

moreover, that Defendant was not the type of person that would have accepted

money in return for favors.  (Id.)  At no time during this interview, however, was

Mr. Rowe called upon to respond to questions about the purported

wrongdoings recited in Racketeering Acts 8 and 9.

Approximately two years after this FBI interview, Mr. Rowe was

summoned before the grand jury to provide testimony regarding Defendant.

There, he declined to answer most of the questions put to him, instead invoking

the Fifth Amendment privilege against self-incrimination.

At a hearing before the Magistrate on May 18, 2005, Mr. Rowe's widow

testified that she was confident that, were her husband still alive, he would have

insisted upon his innocence and that of Defendant.  (Tr. at 17; see also id. at 15,

45.)  Nevertheless, she had not discussed with her husband his willingness to

testify on Defendant's behalf, and had no knowledge of the subject-matter

recited in Racketeering Acts 8 and 9.  (Id. at 21-22.)  Moreover, she was

unaware that Mr. Rowe had invoked the protections of the Fifth Amendment

before the grand jury.  (Id. at 23.)

Mr. Rowe's tax attorney, Cordon Olsen, also testified at the hearing that

he was certain Mr. Rowe would have testified to Defendant's innocence, and

that Mr. Rowe had on prior occasions emphatically denied any wrongdoing on

his part or on the part of Defendant.  (Id. at 55-56 & 63.)  So far as his attorney

was willing to testify, however, Mr. Rowe did not discuss with him the issue of

campaign contributions.  (Id. at 58.)[2]  Nor did Mr. Olsen testify that Mr. Rowe

had indicated to him that he would take the stand on Defendant's behalf or

waive his privilege against self-incrimination.

## C.    Analysis

Without question, the death of a material witness during a period of pre-

indictment delay can result in actual substantial prejudice to a defendant.  See

Mills, 704 F.2d at 1557 (death of witness who had confessed to murder with

which defendant had been charged was "genuinely prejudicial" to defendant's

_____

[2]Mr. Olsen declined to respond to questions that would result in divulging privileged communications.

case) (dicta); United States v. Lindstrom, 698 F.2d 1154, 1158-59 (11th Cir. 1983) (death of two material witnesses was prejudicial to defendant's case) (dicta); see also United States v. Rogers, 118 F.3d 466, 475 (6th Cir. 1997) ("Several circuits have held that the death of a potentially material witness during an undue pre-indictment delay may prove prejudice, but that it is not alone determinative."). Nevertheless, "the death of a witness alone is insufficient to establish actual prejudice." United States v. Floyd, 882 F.2d 235, 242 (7th Cir. 1989) (quoting United States v. Valona, 834 F.2d 1334, 1338 (7th Cir. 1987)); see Corbin, 734 F.2d at 647-48 (three year delay and deaths of four witnesses not actually prejudicial). Consequently, the question before this Court is whether, on these particular facts, Defendant has met his burden of proving actual substantial prejudice based on the death of Mr. Rowe. After carefully reviewing the hearing transcript, the evidence, and the parties' briefs, the Court concludes that he has not.          .

First, Defendant has not shown what Mr. Rowe's exculpatory testimony would have been with the requisite specificity. See, e.g., Corbin, 734 F.2d at 647-48 (amorphous allegations of prejudice insufficient); McKoy, 129 Fed. Appx. at 820 (defendant seeking dismissal of indictment must generally

12

"demonstrate, with specificity, the expected content of [unavailable] witnesses'

testimony") (quoting Jones v. Angelone, 94 F.3d 900, 908 (4th Cir.1996)).

Apart from evidence respecting Mr. Rowe's relatively blanket protestations that

neither he nor Mr. Campbell had engaged in any "wrongs," the Court has been

unable to locate any point in the record that suggests that Mr. Rowe specifically

denied engaging in the acts averred in Racketeering Acts 8 and 9 in the

indictment.  Such acts were not at the heart of the FBI's probe, and neither Mr.

Rowe's widow nor Mr. Olsen could testify that Mr. Rowe spoke of or denied

participating in the specific transactions alleged in those charges.

More fundamentally, however, Defendant's argument fails because he has

not met his burden of showing that Mr. Rowe would have taken the stand on his

behalf.[3]  Under subpoena and under oath, Mr. Rowe declined to profess his

---

[3]The Magistrate likewise found that, in light of Mr. Rowe's invocation of the Fifth Amendment before the grand jury, there was "substantial doubt . . . [regarding whether] Rowe would have testified as a witness for Defendant at trial . . . ."  (See August 2005 Report at 9.)  Although of marginal relevance given the applicable standard of review, for this reason, Defendant's reliance on the Magistrate's statement that, "Rowe protested his and Campbell's innocence to his wife and his tax lawyer and, presumably, *if he testified*, would have declared his innocence at trial" (see August 2005 Report at 7 (emphasis supplied)), is misplaced.  That statement does not, as Defendant contends, show that the Magistrate "[found] that Rowe would have testified to his and Campbell's innocence . . . ." (See Def.'s Objections to the Magistrate R & R Regarding Actual Prejudice [168] at 5.)

innocence or that of Defendant before the grand jury. Rather, he invoked the

Fifth Amendment privilege against self-incrimination, declining to respond to

virtually every germane question he was asked. Neither his tax attorney nor his

widow, notwithstanding their subjective "certainty" that he would have testified

on behalf of Defendant, could testify that Mr. Rowe ever *stated* that he would

have taken a different course in these proceedings, or that he intended to take

the stand in defense of Defendant.

Coupled with his stance before the grand jury, this absence of testimony

leads the Court to conclude that Mr. Rowe would not likely have offered

Defendant exculpatory testimony in this proceeding. Plainly, then, Defendant

did not suffer any "actual substantial prejudice" as a result of his death. See

Rogers, 118 F.3d at 476 (no actual substantial prejudice where, *inter alia*, "it

[was] not clear that the deceased . . . would have testified, especially because he

invoked his Fifth Amendment right in declining to testify before the grand jury");

Floyd, 882 F.2d at 237 & 242 (no actual substantial prejudice where, prior to

client's death, attorney for decedent responded to grand jury subpoena by

stating that his client intended to invoke the Fifth Amendment); United States v.

Automated Med. Labs., Inc., 770 F.2d 399, 404 (4th Cir. 1985) ("find[ing] that

14

[defendant] was prejudiced only slightly, if at all, by the loss of [witness's] testimony[,]" because, *inter alia*, "there is no showing that [witness] would have waived his Fifth Amendment right and have testified at the trial").

Defendant attempts to avoid this result by urging that the statute of limitations would have precluded prosecution of Mr. Rowe by the time he took the stand in this case, and thus, that Mr. Rowe's previous invocation of the Fifth Amendment would not have reoccurred during the trial.  The Court finds this argument unavailing.

To be sure, for a witness to invoke the privilege against self-incrimination, his "fear of conviction on the basis of his testimony must be reasonable, real, and appreciable[,]" see United States v. Gecas, 120 F.3d 1419, 1424 (11th Cir. 1997); *i.e.*, "the privilege applies only in 'instances where the witness has reasonable cause to apprehend danger' of criminal liability."   See United States v. Argomaniz, 925 F.2d 1349, 1353 (11th Cir. 1991).  Conversely, it cannot be asserted where the likelihood of any conviction or prosecution is "remote and speculative."  Gecas, 120 F.3d at 1424.

Here, the specifically identified events alleged in Racketeering Acts 8 and 9 would have taken place more than five years before the time Mr. Rowe would

have been called upon to testify, and thus, viewed in isolation, would not have been actionable under the general federal statute of limitations.  See 18 U.S.C. § 3282 ("Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.").  Given the nature of the charges in this case, however, this does not establish that any prosecution of Mr. Rowe based on statements made at Defendant's trial would have been untimely.

The indictment here alleges that Defendant (and Mr. Rowe) were engaged in a RICO conspiracy that endured through at least 2002.  (See Indictment ¶ 98.)  In the Eleventh Circuit, a charge of participation in a RICO conspiracy is timely so long as *any part* of the conspiracy is alleged to have continued into the limitations period.  See United States v. Gonzalez, 921 F.2d 1530, 1547-48 (11th Cir. 1991).  Furthermore, a conspiracy is considered to endure "so long as its purposes have neither been abandoned nor accomplished."  Id. at 1548 (quoting United States v. Coia, 719 F.2d 1120, 1124 (11th Cir. 1983)).  Indeed, such a conspiracy "is presumed to exist until there has been an affirmative showing that it has terminated."  Id. (quoting Coia, 719 F.2d at 1125).  In light

16

of the foregoing, the Court cannot say that any fear of prosecution on the part of Mr. Rowe based on his testimony at trial would have been unreasonable.

In sum, given the generally amorphous nature of Mr. Rowe's predicted proclamations of innocence and the very real doubt surrounding whether he would have even testified, the Court finds that Defendant has failed to carry his burden of showing an "actual substantial prejudice" resulting from Mr. Rowe's death.  Because the Court finds that Defendant failed to meet this threshold burden, it need not address the question of whether the pre-indictment delay was occasioned by the Government's desire to obtain a tactical advantage. Corbin, 734 F.2d at 647-48 ("We need not reach the question of whether the delay was intended to gain tactical advantage, because the defendants have made no showing that they were prejudiced by the delay.").  Defendant's Objections to the Magistrate Report and Recommendation Regarding Actual Prejudice [168] are **OVERRULED**.  The recommendation of the Magistrate Judge's Report and Recommendation [151] is **ADOPTED**.  Defendant's Motion to Dismiss Indictment for Pre-Indictment Delay [45] is **DENIED**.

17

**II.    Dismissal for Duplicity**

Defendant has likewise moved to dismiss the indictment on grounds of duplicity.  "A duplicitous indictment charges two or more separate and distinct crimes in a single count."  See, e.g., United States v. Burton, 871 F.2d 1566, 1573 (11th Cir. 1989).  Duplicity, if uncorrected, can lead to the conviction of a defendant without unanimity among jurors respecting what offense has been committed, to prejudice against a defendant in a later double jeopardy defense, and to confusion respecting the admissibility of evidence.  United States v. Schlei, 122 F.3d 944, 977 (11th Cir. 1997).

Here, Defendant alleges that the indictment is duplicitous in three respects.  First, he challenges the "Background" section of Count One of the indictment, stating that it charges him with various criminal malfeasance other than the violation of 18 U.S.C. § 1962(c).  Second, again attacking Count One, and placing special emphasis on Racketeering Acts 4 and 5 enumerated therein, Defendant urges that the indictment permits the jury to choose (not necessarily unanimously) among various criminal statutes and/or acts or events in deciding whether a particular racketeering act has been proven.  Finally, Defendant argues that Counts Two through Seven are defective by virtue of incorporating

(purportedly duplicitous) Count One by reference, and by incorporating certain "substantive" allegations of wrongdoing recited within Count One.

The Magistrate rejected Defendant's arguments, finding either that they were predicated on a misconstruction of the indictment, or that, to the extent the indictment presented any duplicity, the ambiguity could be cured through jury instructions and/or special interrogatories. See, e.g., United States v. Marshall, 75 F.3d 1097, 1111-12 (7th Cir. 1996) (rejecting challenge that indictment improperly alleged both extortion and bribery as racketeering acts, explaining that any duplicity could be and was cured by trial court's instruction to jury that "it must unanimously agree as to which offense the defendant was guilty of, if either"); United States v. Robinson, 651 F.2d 1188, 1194 (6th Cir. 1981) ("[A] duplicitous or multiplicitous indictment is remediable by the court's instruction to the jury particularizing the distinct offense charged in each count in the indictment.").  After carefully reviewing the indictment, the Court does not find this conclusion to be erroneous.  The Magistrate Judge's Report and Recommendation [170] is accordingly **ADOPTED**.  Defendant's Motion to Dismiss All Counts of the Indictment as Duplicitous [46] is **DENIED**.

**III.    Disqualification of First Assistant United States Attorney Sally**

**Yates**

Before the Magistrate, Defendant moved for the disqualification of First Assistant United States Attorney Sally Yates.  In doing so, he emphasized that Ms. Yates was significantly involved in the prosecution of many individuals who are expected to testify against him at trial (*e.g.*, by virtue of signing criminal indictments; acting as lead attorney or otherwise participating in investigations; serving as the "approving official" for or otherwise participating in the negotiation of plea agreements; and obtaining or explaining the concept of immunity).  He also emphasized that Ms. Yates was referred to in a surreptitiously recorded conversation between Mr. Rowe and Ronnie Thorton, in which Mr. Rowe stated that Ms. Yates was the impetus behind the criminal prosecutions involving Defendant and the City of Atlanta.  (See Def.'s Objections to the Magistrate's Order [165-1] at Ex. 10 ("That goddamn Sally – Sally Yates is the one pushing all this shit.").)  Finally, Defendant stressed that at a transcribed proceeding related to the sentencing of one government witness, Mr. George Greene, Ms. Yates acknowledged that Mr. Greene had made inconsistent statements under oath (some of which would tend to exculpate Defendant), but continued to recommend a downward departure of his sentence

AO 72A
(Rev.8/82)

notwithstanding a provision of Mr. Greene's plea agreement requiring him to testify truthfully.

The Magistrate denied Defendant's motion in an Order [158] dated August 11, 2005.  Defendant objects to the Magistrate's Order, and the parties have submitted exhaustive briefs respecting the issue of Ms. Yates' disqualification.  The Court finds the objections directed at the Magistrate's Order unconvincing.[4]

### A.    General Principles and Defendant's Asserted Bases for Disqualification

"The disqualification of Government counsel is a drastic measure and a court should hesitate to impose it except where necessary."  United States v. Bolden, 353 F.3d 870, 878-79 (10th Cir. 2003).  Courts have found such disqualification proper in only "limited circumstances[.]"  Id.  Indeed, "[i]n recognition of the fact that a move to disqualify trial counsel has inherent tactical

---

[4]The parties debate what level of deference should be given to the Magistrate's Order.  Recognizing that the decision whether to disqualify counsel is non-dispositive, at least one court has subjected a magistrate's disqualification determination to only "clearly erroneous or contrary to law" review.  See Weeks Stevedoring Co. v. Raymond Int'l Builders, Inc., 174 F.R.D. 301, 303 (S.D.N.Y. 1997).  Defendant, however, takes the position that, given the gravity of the instant issue, the Order should be subject to a more searching, de novo review.  Because the Court would reach the same result under either standard, it need not resolve the issue here.

21

advantages particularly when it occurs after the culmination of extensive trial preparation," courts have tended to require a strong showing from the movant before taking counsel off a case.  United States v. Perlmutter, 637 F. Supp. 1134, 1137 (S.D.N.Y. 1986).

Defendant purports to make such a showing here by relying, so far as the Court can tell, on four distinct arguments.  First, he argues that Ms. Yates should be disqualified because he intends to call her as a witness at trial. Second, he asserts that irrespective of whether the Court permits him to call Ms. Yates to the stand, allowing her to proceed would be improper because, given her obvious and sustained involvement in the investigation concerning the City of Atlanta under his administration, she would obtain an improper level of "witness verity" before the jury.  Next, Defendant argues that the same involvement would necessarily result in Ms. Yates "vouching" for the credibility of government witnesses.  And finally, Defendant urges that permitting Ms. Yates to proceed would undermine the public's confidence in the trial and the justice system.  For the reasons that follow, the Court finds these objections lack merit.

22

**B.      Evaluation of Defendant's Asserted Bases for Disqualification**

1.      Intent to Call Ms. Yates as a Witness

Defendant's first argument in support of disqualification is that "[t]here is

. . . the strong possibility that it will be necessary for the defense to call [Ms.]

Yates as a witness at trial."  (See Def.'s Mot. to Disqualify [132-1] at 2.)  In light

of the well-settled rule that an attorney should not serve as prosecutor and

witness in the same case, he contends that the Court should accordingly

disqualify Ms. Yates from representing the Government here.  See United States

v. Hosford, 782 F.2d 936, 938 (11th Cir. 1986) ("It is clear that a prosecutor

must not act as both prosecutor and witness.").[5]

---

[5]The Eleventh Circuit, quoting Seventh Circuit authority, has expounded on the policies that underlie this prohibition, stating:

> First, the rule eliminates the risk that a testifying prosecutor will not be a fully objective witness given his position as an advocate for the government.  Second, there is fear that the prestige or prominence of a government prosecutor's office will artificially enhance his credibility as a witness.  Third, the performance of dual roles by a prosecutor might create confusion on the part of the trier of fact as to whether the prosecutor is speaking in the capacity of an advocate or of a witness, thus raising the possibility of the trier according testimonial credit to the prosecutor's closing argument. Fourth, the rule reflects a broader concern for public confidence in the administration of justice, and implements the maxim that "justice must satisfy the appearance of

23

The flaw in Defendant's argument stems from the rule a prosecutor should not be called as a witness for the defense except in instances of "compelling need."  See United States v. Roberson, 897 F.2d 1092, 1098 (11th Cir. 1990).  Compelling need may be shown to exist, for example, where the prosecutor has knowledge relating to the essential underlying facts and events that are put at issue by the criminal indictment.  See United States v. Prantil, 764 F.2d 548, 551-54 (9th Cir. 1985) (AUSA should have been disqualified where he "was a witness to, and indeed a participant in, some aspect of all of the events alleged in the indictment"); but compare Hosford, 782 F.2d at 938-39 (while presenting close case, it was not error for prosecutor to participate despite his involvement in the creation and execution of immunity agreement that was "keystone" of defense).  Conversely, such need tends not to exist where other witnesses are available to testify to the same subject, or where the defense intends to call the prosecutor as a means to achieve "duplicative impeachment."

_____

justice."   This concern is especially significant where the testifying attorney represents the prosecuting arm of the federal government.

Hosford, 782 F.2d at 938-39 (quoting United States v. Johnston, 690 F.2d 638, 643 (7th Cir. 1982)).

Prantil, 764 F.2d at 552 ("duplicative impeachment"); see, e.g., Roberson, 897

F.2d at 1098 (no compelling need where "there were other witnesses available"

to testify regarding plea negotiations); United States v. Ashman, 979 F.2d 469,

494 (7th Cir. 1992) (district court did not abuse discretion in declining to

disqualify prosecutor where "[t]here ha[d] been no showing that the testimony

of the lead prosecutor was necessary to [the defendant's] case, or that similar

information could not have been obtained from another source."); United States

v. Brothers, 856 F. Supp. 388, 391 (M.D. Tenn. 1993) (holding that "a

defendant has an obligation to exhaust other available sources of evidence

before a court should sustain a defendant's efforts to call a participating

prosecutor as a witness"); Perlmutter, 637 F. Supp. at 1138 (denying motion to

disqualify prosecutor where defendant "ha[d] not established that [the

prosecutor] ha[d] any information which [was] essential to her defense and

which [could not] be obtained through means other than calling [the prosecutor]

as a trial witness").

     Defendant insists that such "compelling need" exists here for two

reasons.  First, generally speaking, he asserts that Ms. Yates' extensive

involvement with the investigation, prosecution, and plea agreements of

witnesses against him warrants her being called as a witness.  Second, he

focuses specifically on the plea agreement Ms. Yates negotiated with Mr.

Greene, and emphasizes that Ms. Yates should be made to testify about the

"real deal" she entered into with Mr. Greene, and her decision not to prosecute

him for (and indeed, to continue to recommend a downward departure

notwithstanding) perjuries he committed of which she was aware.  Neither

argument persuades the Court.

       As it relates to Defendant's first position, it is no doubt the case that the

defense must be afforded a fair opportunity to show witnesses' motivation

behind testifying, and their understanding of any agreement reached with the

Government that may have influenced their testimony.  See, e.g., Giglio v.

United States, 405 U.S. 150, 154-55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)

(jury is entitled to know of "any understanding or agreement as to a future

prosecution" that would impact witness's testimony); Alderman v. Zant, 22

F.3d 1541, 1554 (11th Cir. 1994) ("This Circuit has emphasized that 'the thrust

of Giglio and its progeny has been to ensure that the jury know the facts that

might motivate a witness in giving testimony.'") (quoting McCleskey v. Kemp,

753 F.2d 877, 884 (11th Cir. 1985) (en banc)).  Indeed, "the exposure of a

witness' motivation in testifying has been labeled by the Supreme Court as an important function of the Sixth Amendment right to cross-examination." <u>United States v. Lankford</u>, 955 F.2d 1545, 1548 (11th Cir. 1992).

That said, this Court has been unable to locate any authority suggesting that a criminal defendant should be able to call a government prosecutor to the stand simply because the prosecutor has been involved, even extensively, in the indictment of, investigation into, and plea negotiation with witnesses adverse to the defense. <u>See</u> <u>United States v. Regan</u>, 897 F. Supp. 748, 758 (S.D.N.Y. 1995), <u>aff'd</u> 103 F.3d 1072 (2d Cir. 1997) ("In many criminal cases, defense counsel seek to make an issue out of the prosecutor's conduct, *e.g.*, by cross-examining witnesses on whether prosecutors sought to influence their testimony or offered inducements for favorable testimony, and disqualification cannot be ordered every time this happens."). That testimony can instead be elicited from the government witnesses themselves, or by introducing the plea agreements into evidence. <u>See</u> <u>Roberson</u>, 897 F.2d at 1098 (no compelling need justified calling prosecutor as witness where "there were other witnesss available" to testify

regarding plea negotiations).[6]  Ms. Yates' involvement in the indictment,

investigation, and plea agreements of government witnesses against Defendant

does not warrant her disqualification here.[7]

---

[6]Defendant, throughout his papers, emphasizes that the defense should be afforded latitude in the type and sources of evidence they present respecting these issues.  While that may be the case, any latitude is necessarily constrained by the rule, cited *supra*, that a prosecutor cannot be called to the stand absent "compelling need."

[7]Defendant relies extensively on Hosford in advocating Ms. Yates' disqualification. There, the Eleventh Circuit rejected a defendant's argument that a prosecutor's participation in his defense was improper, but "emphasize[d] the narrowness of [its] holding[,]" explaining, "The resolution of this issue depends on the particular facts of each case." Hosford, 782 F.2d at 939 n.4.  Defendant insists that this is a stronger case for disqualification than Hosford, pointing out that here, unlike there, (i) he *has* objected to the prosecutor's involvement, and *has* requested that she be called as a witness, and (ii) presumably, that greater emphasis will be placed on Ms. Yates' involvement than was placed on the prosecutor's plea involvement in Hosford.  Cf. id. at 939 (among factors supporting holding were that defendant had not objected before the district court and that "all references to [the prosecutor's] participation were made in passing and without emphasizing his involvement").
    While the Court appreciates these characteristics of the instant proceeding, viewed in isolation, make it an arguably stronger case for disqualification than Hosford, it finds that in at least one crucial respect, this case is also substantially weaker than that presented to the Eleventh Circuit.  There,  the defendant was charged with soliciting and attempting murder.  The prosecutor's personal familiarity involved not his relatively unremarkable role in indicting and negotiating with potential government witnesses, but rather, concerned his personal knowledge respecting a "keystone" element of the defendant's underlying,  factual defense–namely, his involvement in negotiating the immunity/cooperation agreement that the defendant contended he acted on in agreeing to participate in the three charged killings. Id.  Given the tighter nexus such knowledge has with the issue of the defendant's factual innocence or guilt, the Court perceives this case as presenting, on the aggregate, even a weaker basis for disqualification than Hosford–where, again, the Eleventh Circuit found the prosecutor's participation *not* improper.

28

Similarly, Ms. Yates' cited comments concerning Mr. Greene do not justify allowing Defendant to call her as a witness or disqualifying her from prosecuting this case.  Defendant, in an attempt to obtain a contrary result, argues that Ms. Yates' admitted awareness that Mr. Greene had given inconsistent testimony under oath, and her decision nevertheless not to prosecute him and to recommend a downward departure at his sentencing, shows the "extraordinary" nature of the plea deal reached with Mr. Greene to procure his testimony, and that the "real deal" was even more favorable than that reflected in Mr. Greene's written plea agreement.  He contends that such testimony, along with other evidence of pressure applied to government witnesses (*e.g.*, offering to put two prospective witnesses in the same room to discuss the benefits of cooperation; Mr. Rowe's assertion that Ms. Yates was the one "pushing all this shit"), is necessary to "show . . . that if someone had something bad to say about Campbell, they could receive lenient treatment or forgiveness for all or most of their crimes."  (See Def.'s Mot. to Disqualify [132-1] at 10.)

Upon closer examination, however, it becomes apparent that to the limited extent the testimony Defendant proposes to elicit from Ms. Yates about

Mr. Greene would be admissible, such testimony does not rise to the level of "compelling need" required to put a prosecutor on the witness stand. Plainly, Ms. Yates cannot opine as to Mr. Greene's credibility. <u>United States v. Tamura</u>, 694 F.2d 591, 601 (9th Cir. 1982) (no compelling need to call prosecutor to stand to testify regarding witness's initial equivocation because such opinions were "merely the prosecutor's opinions about [witness's] credibility"); <u>cf. also</u> <u>Prantil</u>, 764 F.2d at 552 (holding that prosecutor should have been disqualified, observed: "The district court in this case was *not* faced with a defense request to place the participating prosecutor on the stand for purposes of duplicative impeachment.") (emphasis supplied). Her understanding as it related to the "real deal" reached with Mr. Greene, moreover, insofar as it was imparted to or shared by the witness (and thus, affected his motivations to testify), could be elicited from him without offending the federal court's strong disinclination to place a participating prosecutor in the position of trial witness. <u>See</u> <u>Roberson</u>, 897 F.2d at 1098 (no compelling need where "there were other witnesses available" to testify regarding plea negotiations). What is more, to the extent her understanding was not shared by the witness, the proposed testimony does not implicate the concerns placed at issue by <u>Giglio</u>

and its progeny, but rather goes to the Government's determination and

motivation to bring the Defendant to trial.  Those motivations are not the proper

focus of the jury's consideration, and Ms. Yates' ability to speak to *her* actions

or omissions *vis-a-vis* Mr. Greene does not establish a "compelling basis" for

allowing the defense to compel her testimony.  See United States v. Jones, 52

F.3d 924, 927 (11th Cir. 1995) ("selective prosecution is a defect in the

institution of the prosecution that has no bearing on the determination of factual

guilt . . . [and thus] is an issue for the court to decide, not an issue for the jury");

United States v. Cleveland, No. 96-207, 1997 WL 253124, at *2 (E.D. La. 1997)

(recognizing that "[c]ourts have consistently excluded evidence and argument

by defendants seeking to attack the prosecution's motives in initiating

prosecution[,]" and holding that "evidence concerning the motivation of the

prosecution of any of the defendants is irrelevant to the issue of innocence or

guilt and that any probative value it has is substantially outweighed by its

potential for unfair prejudice and for misleading the jury"); see also Regan, 103

F.3d at 1083 (no compelling need to call AUSA as witness "on the

government's motivation for bringing the investigation or about its tactics before

the Grand Jury").[8]

Simply stated, Defendant has not shown the Court any "compelling need" to call Ms. Yates as a witness in this case. Disqualification of Ms. Yates on the basis of the perceived possibility that she will be called as a witness at trial is unwarranted.

2.   <u>Witness Verity</u>

Next, Defendant states that, because he intends to put at issue Ms. Yates' interaction with government witnesses (*e.g.*, as it relates to their indictment, plea negotiations, and plea agreements), she "will be in the position of having to explain to the jury her actions." (<u>See</u> Def.'s Reply to Government's Resp. to his Objections to the Magistrate's Order [174] at 15.) It is his position that as she or a colleague does so, Ms. Yates will improperly take on "witness verity." (<u>Id.</u>)

---

[8]Defendant cites <u>United States v. Ouimette</u>, 753 F.2d 188 (1st Cir. 1985), to support the view that "Yates' state of mind, intent and plan will be an issue at trial." That case has nothing to do with evidence respecting the prosecution's determination to try or convict a defendant, and does not assist Defendant here. To the contrary, <u>Ouimette</u> only held that police officers' statements that explained their actions as they looked for a gun allegedly dropped by the defendant in a case charging the defendant, a felon, with possession of a firearm were admissible to show the officers' intent–such explanations went directly to the underlying factual charge in that case.

32

The Court appreciates that it would be impermissible for an attorney, either expressly or implicitly, to take on the role of an "unsworn witness" in a criminal case, and that a prosecutor's assumption of such an amorphous, dual capacity "is subject to strictest scrutiny[.]"  See, e.g., Hosford, 782 F.2d at 939 ("[I]t would improper for a government attorney who has independent personal knowledge about facts that will controverted at the trial to act as a prosecutor (1) if [s]he uses that inside information to testify indirectly by implying to the jury that [s]he has personal knowledge or insight, or (2) if [s]he is selected as prosecutor when it is obvious that [s]he is the sole witness whose testimony is necessary to establish essential facts not otherwise ascertainable."); see also Prantil, 764 F.2d at 555-56 (disqualification warranted where prosecutor made statements before jury insinuating or alluding to personal knowledge).

That said, the Court does not find that Ms. Yates' previous interaction with government witnesses will necessarily and inevitably lead to her assuming such a status here.  A prosecutor does not attain witness verity merely by virtue of the jury's awareness that she played a role, even a substantial one, in the pretrial preparation of the case.  See, e.g., Regan, 103 F.3d at 1083 ("The jury's awareness of [the prosecutor's] role in the grand jury proceedings did not by

33

itself make [the AUSA] an unsworn witness for the government."); <u>Brothers</u>,

856 F. Supp. at 391-92 (prosecutors, despite involvement in relevant immunity

negotiations, were permitted to continue with instruction to avoid obtaining

"witness verity" through carefully crafted inquiries); <u>cf.</u> <u>Regan</u>, 897 F. Supp. at

758 ("In many criminal cases, defense counsel seek to make an issue out of the

prosecutor's conduct, *e.g.*, by cross-examining witnesses on whether

prosecutors sought to influence their testimony or offered inducements for

favorable testimony, and disqualification cannot be ordered every time this

happens.").  Moreover, except in the most unusual case, it would be premature

for a court to disqualify a government attorney from representation based on the

mere possibility that the prosecution would conduct itself in such a way as to

blur the distinction between advocate and witness.  <u>See</u> <u>Brothers</u>, 856 F. Supp.

at 392 (rejecting pre-trial "witness verity" argument, noting that insinuations of

personal knowledge could be avoided through "phrasing . . . questions in a

neutral fashion"); <u>see also</u> <u>Regan</u>, 103 F.3d at 1083 (rejecting witness verity

argument where there was no "indication in the record that [the AUSA] sought

to use her first-hand knowledge of [the defendant's] case to influence the jury");

<u>Ashman</u>, 979 F.2d at 494 n.15 (rejecting unsworn witness argument because

34

"the prosecutor made no reference to his presence at the interview or his personal knowledge of the incident").  But cf. United States v. Edwards, 154 F.3d 915, 922 (9th Cir. 1998) (in case where prosecutor himself discovered critical and disputed evidence during the trial, "all [he] had to do in order to convey to the jury his . . belief–indeed his representation, based on personal knowledge–that the [evidence] was legitimate and that it was found on the up-and-up, was simply to continue to play the role of objective prosecutor"). While this Court will carefully scrutinize the Government's actions to ensure that the prosecution does not take on "witness verity" before the jury, it will not disqualify Ms. Yates at the outset based on speculative assertions about what may transpire at trial.

3.    Vouching

Defendant additionally argues that Ms. Yates should be disqualified because, due to her interaction with government witnesses, she will necessarily "vouch for" the credibility of such witnesses by putting them on the stand.  The Court finds this argument likewise lacks merit.

Without question, "[a]ttempts to bolster a witness by vouching for his credibility are normally improper and error."  See United States v. Sims, 719

35

F.2d 375, 377 (11th Cir. 1983) (quoting United States v. Ellis, 547 F.2d 863,

869 (5th Cir. 1977)[9]).

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

United States v. Young, 470 U.S. 1, 19, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985).

The "test" for whether a prosecutor has improperly vouched for the

credibility of a witness, however, "is whether the jury could reasonably believe

that the prosecutor was indicating a personal belief in the witness' credibility."

Sims, 719 F.2d at 377.  That requires that the defendant show either that the

prosecution placed the prestige of the government behind the witness through

explicit personal assurances of the witness's veracity, or that the prosecutor

_____

[9]The U.S. Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the U.S. Court of Appeals for the Fifth Circuit handed down prior to September 30, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981).

implicitly vouched for the witness's veracity by indicating that information not presented to the jury supports that testimony.  United States v. Cano, 289 F.3d 1354, 1365 (11th Cir. 2002).

As the Magistrate correctly noted, the focus of either subset of the "vouching" inquiry is on what the prosecutor actually *did*–not what the prosecutor *may do*.  (See Magistrate Order [158] at 10-12.)  Outside the unusual case, it would be premature to resolve Defendant's objection at this stage of the proceeding.  Cf. Cano, 289 F.3d at 1365-66 (analyzing and rejecting "vouching" objection, looked to record of what actually occurred in court); United States v. Knowles, 66 F.3d 1146, 1161-62 (11th Cir. 1995) (same); Sims, 719 F.2d at 377-78 (same); Ellis, 547 F.2d at 869 (same).  Defendant's objections, to the extent predicated on the "vouching" doctrine, are overruled.

### 4.    Appearance of Impropriety

Throughout his papers, Defendant often alludes to his belief that permitting Ms. Yates to proceed as prosecutor in this case, at a minimum, results in the "appearance of impropriety."  He observes, correctly, that one of the primary policies underlying the prohibition on prosecutors serving as actual or *de facto* witnesses is the "concern for public confidence in the administration

of justice," see Hosford, 782 F.2d at 939 (quoting Johnston, 690 F.2d at 643),

and argues that her disqualification must be ordered to preserve that confidence.

The Court appreciates Defendant's concerns, and remains mindful of the

need to avoid the appearance of impropriety in this case.  To that end, it will

carefully scrutinize the Government's conduct during these proceedings to

ensure that no improper "witness verity" attaches to the prosecutors, and that

no impermissible "vouching" occurs.  It does not believe that the public's

confidence in the judicial process will be in any way eroded, however, by having

a prosecutor who participated in the indictment of, investigation into, and plea

negotiation with government witnesses represent the Government.  For purposes

of efficiency, such participation is altogether routine, and the Court struggles to

see how the public–presumably aware of such an approach to criminal

prosecution–would have their confidence in the administration of justice

diminished by Ms. Yates' participation as an advocate here.  Cf., e.g., Regan,

103 F.3d at 1083 ("Given [the AUSA's] familiarity with the case, replacing her

without a compelling reason to do so would have been an unwarranted waste of

resources.").

## IV.    Waiver of Privilege

38

At the hearing held before this Court on August 12, 2005 [161], counsel for Defendant raised an issue respecting certain potentially relevant documents that had been produced to the Government by an attorney for Mr. Sam Barber, an expected witness.  While the Government had initially turned over copies of those documents to Mr. Sadow–an attorney for the Defendant who was subsequently permitted to withdraw from representation in this matter–it had since learned the documents were produced to them inadvertently by Mr. Barber's counsel, who now claims they are protected by the attorney-client privilege.  The Government requested that the copies in Mr. Sadow's possession be returned.  Defendant objected, arguing that any privilege that would have otherwise shielded the documents was waived by their production to the Government.  The Court indicated that it would review the privilege log and the documents *in camera* in an effort to determine whether further proceedings were necessary to resolve the issue of waiver.

While the approaches taken by the federal courts in determining whether inadvertent disclosure results in the waiver of the attorney-client privilege remain varied, the prevailing view is that the inquiry into waiver must be made on a case-by-case basis.  Briggs & Stratton Corp. v. Concrete Sales & Servs., 176

39

F.R.D. 695, 699 (M.D. Ga. 1997); <u>see also</u> <u>In re Polypropylene Carpet Antitrust</u>

<u>Litig.</u>, 181 F.R.D. 680, 689 (N.D. Ga. 1998) ("[T]he prevailing view in courts of

this circuit--and other circuits as well--is that a waiver can be found only after

performing a balancing test that assesses the [producing party's] conduct in

inadvertently releasing the information, the sensitivity of the information, and

Plaintiffs' need for the information"[;] adopting five-factor test announced in

<u>Briggs</u>).  <u>But see</u> <u>BellSouth Adver. & Publ'g Corp. v. Am. Bus. Lists, Inc.</u>, No.

1:90-CV-149-JEC, 1992 WL 338392, at *8 (N.D. Ga. Sept. 8, 1992)

(inadvertent disclosure of documents constitutes *per se* waiver of the

attorney-client privilege).  Five factors must be considered:

> (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production;
>
> (2) the number of inadvertent disclosures;
>
> (3) The extent of the disclosure;
>
> (4) any delay and measures taken to rectify the disclosures; and
>
> (5) whether the overriding interests of justice would be served by relieving a party of its error.

<u>Id.</u> (<u>citing</u> <u>United States v. Pepper's Steel & Alloys, Inc.</u>, 742 F. Supp. 641,

643 (S.D. Fla. 1990)).

Here, approximately 170 pages of ostensibly privileged communications and work-product concerning the American Computer Technology, Inc. v. City of Atlanta litigation[10] were produced to government counsel by Mr. Barber's attorneys.  At least some of these documents appear to contain information relevant to the charges at issue in this litigation, and in particular, Counts One (Racketeering Acts 1 through 3) through Four.  Beyond that, however, the Court does not have before it any testimony of Mr. Barber's counsel suggesting the extent of the overall document production; any acts taken by counsel, other than responding to the Government's post-production inquiries regarding privilege, to rectify the inadvertent disclosures; or how the "interests of justice" would be served by refusing to find waiver.[11]  Simply stated, while its review of the relevant documents helps to inform the Court's decision respecting waiver, the current state of the record does not permit it to rule on the issue at this juncture.

---

[10]American Computer Technology, Inc. v. City of Atlanta, Fulton County Superior Court, No. 2001 CV 35168.

[11]According to the Government, Mr. Barber's counsel, due to a "conflict," was unable to attend the August 12, 2005 hearing.

Counsel for Mr. Barber will therefore be permitted to submit a brief with supporting affidavits, within ten (10) days of this Order, addressing the foregoing issues and the propriety of upholding the privilege in the instant case. The Clerk is **DIRECTED** to serve a copy of this Order upon Mr. Barber's counsel, Mr. Edward T. M. Garland, Garland Samuel & Loeb, 3151 Maple Drive, N.E., Atlanta, GA 30305-2500.  Upon receiving Mr. Garland's response, the Court will determine whether an evidentiary hearing is necessary to resolve the issue of waiver, or whether the record is sufficiently complete to rule on the basis of the facts then before it.

### Conclusion

Defendant's Objections to the Magistrate Report and Recommendation Regarding Actual Prejudice [168] recommending the denial of his Motion to Dismiss Indictment for Pre-Indictment Delay [45] are **OVERRULED**.  The recommendation of the Magistrate Judge's Report and Recommendation [151] is **ADOPTED**.  Defendant's Motion to Dismiss Indictment for Pre-Indictment Delay [45] is **DENIED**.

The Magistrate Judge's Report and Recommendation [170] suggesting

42

the denial of Defendant's Motion to Dismiss All Counts of the Indictment as Duplicitous [46] is **ADOPTED**.  Defendant's Motion to Dismiss All Counts of the Indictment as Duplicitous [46] is **DENIED**.

Defendant's Objections to the Magistrate's Order Denying his Motion to Disqualify First Assistant United States Attorney Sally Yates [165] are **OVERRULED**.

Finally, Counsel for Mr. Samuel Barber, Jr. will be permitted to submit a brief with supporting affidavits, within ten (10) days of this Order, supporting his view that any privilege attaching to the documents he inadvertently produced to the Government in this case should be upheld.  The Clerk is **DIRECTED** to serve a copy of this Order upon Mr. Barber's counsel, Mr. Edward T. M. Garland, Garland Samuel & Loeb, 3151 Maple Drive, N.E., Atlanta, GA 30305-2500.  The Clerk is further **DIRECTED** to submit this case to the Court upon the expiration of that ten day period.

AO 72A
(Rev.8/82)

**SO ORDERED** this __24th__ day of October, 2005.


/s/ Richard W. Story
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

44