IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **UNDER SEAL** |
| | : | |
| v. | : | CRIMINAL ACTION |
| | : | NO.  1:04-CR-424-RWS |
| WILLIAM C. CAMPBELL | : | |
| | : | |

## **GOVERNMENT'S SENTENCING MEMORANDUM**

Comes now the United States of America, by and through undersigned counsel, and
files this Government's Sentencing Memorandum as follows:

### **I. INTRODUCTION**

On March 10, 2006, the jury found defendant guilty of three counts of tax fraud and
Racketeering Act 10, defrauding his campaign creditors and donors.  Immediately following
the verdict, defendant took to the courthouse steps, the frequent platform for his "testimony"
throughout the trial, to minimize and obscure from the public the finding of their fellow
citizens.  Following his familiar pattern of blaming someone else for his own misconduct,
defendant denigrated the jury's guilty verdict on tax fraud by falsely claiming that the tax
convictions were due to "sloppy record keeping," involve only "fairly minor speech income"
and then blamed his accountant for his own criminal conduct.  See Ex.A attached hereto.

Defendant  remains unwilling to accept the jury's verdict and the consequences of his
own actions in seeking an outcome in sentencing wholly inconsistent with the jury's finding.

1

He also relies upon an ever changing and growing pattern of "truth of convenience" to deny criminal behavior.   This is sharply illustrated by defendant's contradictory positions concerning his gambling income.  At trial, in an effort to explain the uncontroverted evidence that defendant was spending large sums of unexplained cash,[1] defendant claimed that the cash was not corrupt payments, but rather was gambling proceeds.  The jury held defendant accountable for the flow of unreported cash through his hands and convicted him on the three tax fraud charges and also found him guilty of defrauding his campaign donors and creditors. Remarkably, having defended the corruption charges at trial by claiming that he made at least $20,000 per year in the Friday night poker games, defendant now disavows his trial defense. The income calculations that defendant presented to the probation officer contain no gambling winnings at all; instead, now that defendant has been convicted of tax fraud and his sentence will be determined in part by the amount of his unreported income, defendant seeks to explain his cash expenditures by creating a non-taxable source of cash.  In a stunning development, defendant now claims that he received thousands of dollars in secret cash gifts from his late mother coincidently during the tax years of conviction, 1996, 1997 and 1998 and a mysterious cash hoard.

Not only is defendant now denying his trial defense, the evidence reveals that defendant engaged in a pattern of obstruction spanning from the inception of the investigation through his submissions to the Probation Officer.  For example, the government

---

[1] The "unexplained cash" was established through documented cash expenditures that far exceeded defendant's withdrawals of cash from his bank accounts and cashed checks.

has learned that during the grand jury investigation, after defendant knew that his poker

winnings were at issue in the investigation, defendant took records from Gabe Pascarella

reflecting defendant's wins and losses in the poker games, as well as records reflecting cash

payments Campbell made to Pascarella.  In short, defendant hid records that could have shed

light on whether he really won at the poker games, and then falsely claimed at trial that his

cash expenditures were explained by poker winnings.  He now disavows that very defense

because it no longer benefits him and he has continued to obstruct justice by presenting

blatantly false information to the probation officer concerning the source of his cash and the

amount of his unreported income.

Defendant's pattern of false and deceptive conduct during this case is consistent with

his propensity to engage in false and misleading conduct.  For example, as discussed later,

the Florida Board of Bar Examiners filed an "Allegation of Material Misstatement and/or

Material Omission" based upon defendant's sworn testimony before the Bar that was "false,

misleading or lacking in candor."

Under 18 U.S.C. § 3553, the Court is to consider a number of factors in determining

the appropriate sentence, including the nature and circumstances of the offense and history

and characteristics of the defendant; the need for the sentence imposed to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for

the offense; to afford adequate deterrence to criminal conduct; to protect the public from

further crimes of the defendant; to provide defendant with needed training or treatment.  This

Court's sentence should reflect that, contrary to defendant's assertions, it is a serious crime to cheat on your taxes, particularly when you are a public official paid by the taxpayers and entrusted to uphold the law.   The sentence should also reflect that it is unacceptable to obstruct the justice system through falsities and manipulation – that there are real consequences for defendant's actions. Finally, the Court's sentence should speak clearly and without equivocation such that defendant's protestations cannot not obscure and diminish the jury's verdict.

## II. APPLICABLE SENTENCING LAW

Not only has defendant refused to accept the jury's verdict and take responsibility for his actions, he also continues to insist that the rules don't apply to him.  The law governing sentencing standards is clear, but defendant demands that this Court apply the law differently to him than it applies to every other defendant.  For example, the law is clear that the standard of proof for sentencing is a preponderance of the evidence, not proof beyond a reasonable doubt as at trial. See e.g., United States v. Murphy, 2006 WL 1374492, *4 (11th Cir. 2006) ("post-Booker, sentencing courts can make factual determinations using a preponderance-of-the-evidence standard, and sentence a defendant on the basis of such factual findings, even if the defendant did not admit to those facts"). Likewise, defendant's omitted income, and consequent tax loss, need not be established with precision or certainty; rather, the law requires only a reasonable estimate given the circumstances. See U.S.S.G. § 2T1.1, comment. (n.1) (1998) ("In some instances, such as when indirect methods of proof

4

are used, the amount of the tax loss may be uncertain; the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts"). The law is equally clear that in determining the appropriate sentence, the Court is to consider all relevant conduct, not just the evidence of the counts of conviction. See U.S.S.G. § 1B1.3 (1998). In United States v. Watts, 519 U.S. 148 (1997), the Supreme Court held that conduct underlying charges for which the defendant has been acquitted is appropriately considered at sentencing. The Court noted that sentencing courts have broad discretion to consider various kinds of information, and the jury cannot be said to have "necessarily rejected" any facts when it returns a not guilty verdict under the reasonable doubt standard. Id. Thus, since Watts, courts have upheld reliance on acquitted conduct. See e.g., United States v. Duncan, 400 F.3d 1297 (11th Cir. 2005) (holding that even after Booker, sentencing judges can continue to consider relevant acquitted conduct). Defendant, however, inexplicably demands a different set of rules. He insists that only tax loss from 1997-1999 be considered; that only evidence presented at trial concerning defendant's unreported income be considered; and that the government establish defendant's tax loss with precision. This simply is not the law, and defendant is not entitled to some made-up group of rules to govern his sentencing.

## III. CALCULATION OF OMITTED INCOME

The Probation Officer correctly calculated defendant's omitted income and consequent tax loss. Defendant omitted from his tax returns income from several different sources, including speaking fees; rent from Dewey Clark; personal use of campaign funds;

5

scalped World Series tickets; and cash income evidenced by cash expenditures. At trial the government presented substantial evidence that the source of the cash was corrupt payments; defendant claimed that the cash came from poker games. It is not necessary, however, for this Court to determine whether the source of defendant's cash was corrupt payments or gambling–either way it is criminally derived income that defendant failed to report.

A.   Unreported Speech Fees

It is undisputed that defendant omitted some of his speech income from his tax returns. More specifically, as established at trial, defendant concedes that he omitted $14,322 in 1996; $9,500 in 1997; and $17,000 in 1998. Defendant's 1999 tax return was filed in October, 2000, after defendant knew that he was under investigation. Consequently, defendant reported all of his 1999 speech income.

B.   Clark Rental Income

Defendant received approximately $300 per month in rental income from Dewey Clark from 1997 through May of 1999. Clark testified that Campbell asked Clark to pay him in cash. Clark further testified that there was a period of time (during the Michael Childs' payments) when defendant told him that he did not have to pay rent. (Clark testimony at 15, 86). Consequently, the probation officer correctly excluded from the calculation rental income from August, 1997 through October, 1998.

In an effort to avoid the sentencing consequences of the rental income, defendant now falsely claims that he did not receive any rent from Clark. Defendant takes this new position

despite the fact that he did not dispute his receipt of cash rent payments from Clark at trial.

Indeed, despite a cross examination spanning two days, defendant never once cross examined

Clark regarding his payment of rent to defendant.  In fact, defense counsel referenced rent

as a source of cash in his closing.  See Martin Closing at 24.  Defendant's current false denial

of rental income is also contradicted by several checks written to cash on Clark's bank

account during 1996 - 1998 that specifically include the notations of "rent" and "rent Bill

Campbell" in the memo line.  See Ex. B attached hereto (Clark's bank records contain other

$300 checks to cash without a specific notation of "rent" on the memo line).    Further,

defendant's false denial–of a relatively small amount of income--is yet another example of

defendant's obstruction and pattern of creating an evolving "truth" to suit his current

circumstances.

C.    Personal Use of Campaign Funds

    The jury found defendant guilty of Racketeering Act 10, defrauding his campaign

contributors and donors by falsely telling donors that money was needed to retire a campaign

debt, and then using those campaign funds for personal purposes.  Defendant, however,

refuses to accept the jury's verdict.  Following trial, defendant moved for a judgment of

acquittal on this racketeering act claiming that "it was unduly vague and there was no

evidence to support it."  Motion for Judgment of Acquittal at 2.  Defendant argued then, as

he argues now, that "defendant had no involvement in the accounting of the campaign fund"

and that he "relied on advice of counsel with respect to the use of any campaign funds."

7

Motion at 2. Not only did the jury reject defendant's argument, the Court also rejected defendant's attempt to undo the jury's verdict and specifically held that "the finding was made by the Jury and is supported by the evidence." The Court concluded "that there is no basis for overturning that decision." Order at 2.

Moreover, as the Probation Officer notes, defendant incorrectly claimed to her that, "Agent Salinski testified at trial that he could not determine any personal income from the campaign fund and inserted a '0' on the chart displayed to the jury." Addendum at 23-25. In truth, Special Agent Salinski specifically included on the "Alleged Unreported Income" chart, rent from Dewey Clark, personal expenses paid from the campaign, and gambling income. See Gov. Ex. 1178. The chart did not have a specific amount listed in these categories because Agent Salinski testified that he was not sure of the "exact amounts." See Salinski testimony at 105-106. Of course, exact amounts are unnecessary for sentencing.

Defendant also falsely told the Probation Officer that "the only testimony or evidence at trial regarding the payment of cell phone bills for the Mayor and his wife was by former Mayor Andrew Young . . ." Addendum at 23, 24. In actuality, IRS Revenue Agent Deborah Fitzpatrick testified about the payment of cell phones for Mayor Campbell, his wife and his son beginning in 1998, well after the campaign was over. See Fitzpatrick testimony at 42-43; Gov. Ex. 948.[2]

_____

[2] Indeed, when defense counsel objected to Agent Salinski's characterization of "personal expenses" paid from the campaign, the Court noted that there was evidence of personal expenses paid from the campaign, specifically citing cell phones. Salinski testimony at 105.

8

The Probation Officer correctly and conservatively calculated defendant's income from personal expenditures from the campaign account. Although there were numerous additional questionable expenses paid from the campaign account years after the campaign was over (November, 1997), the probation officer's calculation includes only cell phone expenses for defendant and his family beginning in 1998 and personal travel/personal credit card expenses paid by the campaign. The personal nature of the trips was determined by comparing the total travel itemized in the travel summary (Gov. Ex. 925) with defendant's business travel, as identified by defendant's witness, Eunice Lockhart Moss.

Defendant also incorrectly claims that "he was not even involved in the decision regarding which bills were paid." Addendum at 23. Defendant claims that, "Steve Labovitz testified the decision to pay a particular bill or portion of a bill was totally his decision." Id. As the Probation Officer notes, however, the testimony to which defendant cites has nothing to do with the payment of expenses incurred by Mayor Campbell. Addendum at 25. Rather, that testimony relates to campaign expenses incurred during the course of the campaign. Moreover, Mr. Labovitz's testimony was precisely the opposite of defendant's representation. He testified that after the campaign was over, he did not review the expenses; he simply accepted what Mayor Campbell sent over through Eunice Lockhart Moss. (Labovitz testimony at 114 - 117; 123 - 129).

The Probation Officer also correctly included the campaign payments for cell phones for Mayor Campbell, Mrs. Campbell, and defendant's son. There is no evidence that

defendant's cell phone charges incurred after the campaign were for maintenance of his office. In fact, defendant had a separate City of Atlanta cell phone that he used during the time that the campaign paid for his personal phone. Moreover, an analysis of defendant's use of the phone confirms its personal nature. For example, an analysis of three months of calls reflects that an average of 70% percent of the outgoing calls were to defendant's home, family members, Martina Jiminez, Bert Fitts or Gabe Pascarella. (Incoming calls do not reflect a telephone number). Additionally, an analysis of all the phone records reveals that approximately half of the combined incoming and outgoing calls were either to these same individuals or between 11:00 p.m. and 6:00 a.m. Ms. Brooks advised agents that defendant would frequently call her late at night and she would call him back on his cell phone. The phone records reflect a number of late night calls to defendant's calling card number used for long distance calls (Ms. Brooks lived in Chicago), and an immediate incoming call often lasting for hours. There were almost no late night calls on defendant's City of Atlanta cell phone.

D.     World Series Ticket Income

Defendant objects to the inclusion of $2000 for the scalped World Series tickets claiming that the tickets defendant sold to Richard Matero may not be the tickets purchased by the campaign because Mr. Matero did not remember the particular seat numbers. Defendant's bank records, however, reflect no purchases of any World Series tickets. Therefore, even if defendant's argument is true, defendant purchased the tickets that he sold

to Matero with cash, and that cash is additional cash income for defendant. Additionally, during Matero's testimony, the government proffered that Matero would testify that the man sitting behind him at the game asked him why he was sitting in the Mayor's seats (which are the seats paid for by the campaign). This hearsay, which is admissible at sentencing, supports that defendant sold the tickets purchased by the campaign to Matero. Finally, the $2000 check from Matero was deposited into defendant's personal bank account.

E.      Cash Income

        1.      Defendant's Admission to Cash Income

        The probation officer set forth two alternative methods for determining the amount of cash income defendant did not report. The first method is based upon defendant's admission at trial that he had $80,000 in cash income during 1996 and 2000 which he claimed came from poker. At trial, defendant claimed that he made $20,000 per year during 1997, 1998, and 1999 and $10,000 per year during 1996 and 2000 from the Friday night poker games. On cross examination of Gabe Pascarella, defendant had Pascarella confirm an estimate of $20,000 per year in poker winnings during 1997-1999 and $10,000 per year in 1997 and 2000. (Pascarella testimony at 55-62). Moreover, defendant made numerous statements to the media about his alleged poker winnings. For example, defendant stated, "I made about $20,000 a year just at the poker games, and, of course, as you know, I also occasionally went to casinos as well. I seem to remember the government calling several witness to say that I had a lot of chips which would seem to indicate I was winning." See

11

Disc 1 attached hereto. Defendant made numerous other statements to the media claiming

that he won $20,000 per year in the poker games. In response to a reporter's statement that

they had not heard from the defense about the source of defendant's cash, defendant said, "I

think you actually did hear about that from one of the first witnesses, Gabe Pascarella."

Defendant referenced "an awful lot of Friday poker nights" and commented that, if one looks

at the "overlap of what Mr. Pascarella said that I made in these poker games versus what the

prosecution said, I don't think there's any doubt . . ." See Disc 2 attached hereto. The

government has attached some additional statements by defendant claiming cash income in

the form of poker winnings. See Disc 3.

Defendant not only claimed at trial that the poker games were the source of his cash,

he vociferously fought admission of that evidence. In a pretrial motion, defendant advanced

the position that, "in reality, defendant usually lost the poker games and always paid his own

way in the casinos." (Defendant's Post Hearing Brief at 4, citing testimony as to what Ricky

Rowe told a third party). Defendant took that position because, prior to trial, defendant

thought the government's theory was that contractors intentionally lost to defendant at the

poker games. This is another example of defendant's "evolving truth."

Turning an about face at trial, defendant pounded his gambling defense home in

closing argument. Defense counsel told the jury that "we clearly believe there are poker

winnings." Martin closing at 23. Defense counsel then displayed a chart for the jury

showing $20,000 per year for 1997 - 1999 and $10,000 in 1996 and 2000. Defendant used

the estimated poker winnings to argue that the winnings greatly increased his available cash,

thus explaining his expenditures. See Martin closing at 23-25. Thus, based upon defendant's

own statements to the media, and his position at trial, defendant has admitted to $80,000 in

cash income, which he claimed was gambling proceeds. If the Court relies upon defendant's

admissions of cash income, it is not necessary for the Court to determine defendant's cash

expenditures. Defendant's omitted income under this analysis is set forth at Exhibit C.

2.    Cash Expenditures

Defendant's admission to receipt of cash is corroborated, however, by the alternative

method of determining defendant's cash income – the cash expenditures method.[3]  The tax

analysis following the cash expenditures method is set forth at Exhibit D.  The Probation

Officer correctly calculated these expenditures from the documented cash expenditures

established at trial (utility payments, Pascarella reimbursements for travel, cash deposits, etc.

listed at Gov Ex. 1141) as well as some additional cash expenditures.  The additional cash

expenditures are as follows:

a.    Charitable Contributions

On his tax returns, defendant claimed deductions for charitable contributions in "cash

or check" in the following amounts: $4,480 in 1996; $4,850 in 1997; $4,975 in 1998; $4,750

in 1999, and $4,675 in 2000.  A review of defendant's bank account and credit card records

_____

[3] There was also substantial evidence of corrupt payments presented at trial.  The Court
may rely upon this evidence, under the preponderance standard, to establish defendant's cash
income.

reveals, however, that defendant actually made extremely limited charitable contributions in the following amounts: $285 in 1996; $100 in 1997; $200 in 1998; $160 in 1999; and $125 in 2000. See Ex.E.  Thus, if defendant was truthful on his tax return, the remainder of his charitable deductions must have been made in cash.  If he falsely claimed deductions for charitable contributions he never made, the falsely claimed deductions are additional income to him.  Under either scenario, the additional figures must be included in defendant's income calculations.

In his objections to the Presentence Report, defendant falsely asserts that his claimed deductions for charitable contributions are actually "in kind" contributions, such as clothing, furniture, etc., and that "there is no separate line for in-kind contributions." Addendum at 18. Defendant's representation to the Probation Officer is patently untrue.  Not only is there a separate line for in kind contributions, right below the cash or check line, defendant made separate claims for deductions each year for his purported in kind contributions.  See Exhibit F as an example attached hereto.   Thus, defendant has further compounded his charitable contribution fraud by presenting false information to the Probation Officer.

b.    Additional Pascarella Cash Reimbursements

At trial, in an effort to simplify the evidence, the government introduced evidence of cash expenditures made to reimburse Pascarella for travel expenses charged for Campbell or his friends only from the "dedicated" credit card that Pascarella used almost exclusively for Campbell's purchases.  In addition, Pascarella used his own card for some of Campbell's

purchases. Pascarella has identified the charges that Campbell made in cash from this account, which totals $1,057 in 1997 and $476 in 1998.

> c.    The Children's School Cash Payment

Mrs. Campbell purchased two postal money orders with cash, totaling $1600, for tuition payments. As the Court will recall, the government received this additional documentation of cash payments after it rested its case-in-chief, and sought admission of the documents during rebuttal.

> d.    Cash for Food and Gasoline

The Probation Officer included in the calculation of cash expenditures conservative amounts of expenses for ordinary and necessary expenses for defendant and his family for food and gas. While investigating agents were able to trace some of defendant's cash expenditures, the vast majority of his cash expenditures can never be found. Even if the government had specific information about every grocery store and gas station used by defendant and his family, such businesses do not keep records reflecting the names of cash purchasers. A conservative estimate, however, of defendant's cash expenditures for food and gas for his family of four can be made by referencing the Bureau of Labor statistics.

The Bureau of Labor compiles statistics of an average family with income over $90,000 for food at home, food away from home and gasoline. The amounts of $8,629.48 for 1996, $9,268.00 for 1997, $11,217.04 for 1998, and $11,064.00 for 1999 are estimates of defendant's cash expenditures for such expenses. These estimates were obtained from the

Bureau of Labor Statistics for the relevant years. Since the statistics represent a family of 3.1, they were adjusted to represent a family of four. Any amounts paid for food or gas reflected in defendant's bank or credit card records were subtracted so that the estimates represent only the amounts paid for such expenses in cash. Additionally, as reflected in the Probation Officer's Addendum to the Presentence Report, the amount attributed to food away from home was further reduced to eliminate any potential double counting based on the estimation of personal travel meals discussed below. Further, the gas and oil calculation was reduced by one-half since defendant had access to a City vehicle. See Ex. G attached hereto.

The evidence at trial supports the conservative nature of the amounts attributed to defendant's use of cash for food and gas for his family of four. At trial, the government presented evidence that defendant and his wife spent minuscule amounts by credit card for food and gas. For example, the evidence showed that defendant and his wife purchased groceries by check or credit card in the amount of only $279.14 for 1998 and $169.37 for 1999 for his family of four. Gov. Ex. 1153. Gov. Ex. 1152. Likewise, defendant's credit card reflects few charges at restaurants: $370.13 for 1997, $30.62 for 1998, and $235.69 for 1999. Gov. Ex. 1154. Clearly, it is impossible for a family of four to live off of $169 in groceries for an entire year, particularly when the charges for eating out are also minuscule. The evidence also showed that his family gas purchases by credit card were a mere $383.98 for 1997, $124.49 for 1998, and $395.13 for 1999. Defendant was using cash for food and gas purchases and would have known that such cash expenditures would be virtually

impossible to trace. It is eminently reasonable to apply Bureau of Labor statistics to estimate how much cash he would have had to spend for food and gas, especially since those calculations take into account defendant's travel and use of a City car.

e.     Cash expenditures for Meals on Personal Travel

The Probation Officer also included in the calculation of cash expenditures conservative amounts of expenses for personal travel meals based on federal per diem rates. The amounts of $4,740 for 1997, $3,976.98 for 1998, and $6,859.99 for 1999 are estimates of defendant's cash payments for food and incidental expenses during his extensive personal travel in 1997 through 1999. The trips attributed to personal travel were determined by comparing the total summary of defendant's travel introduced by the government at trial through FBI Special Agent Mile Brosas (Gov. Ex. 925) with the schedule of defendant's business travel prepared and authenticated by defendant's witness, Eunice Lockhart-Moss (Gov. Ex. 196). After subtracting from the summary of travel all business related trips, the remaining trips were included in the computation of personal travel meals. No expenses were attributed, however, to defendant's travel to Raleigh, NC where Campbell's family resided. For the non-Raleigh personal trips, which amounted to approximately 90 trips, the amount of cost for food  was computed based on the number of travelers (Campbell, his family or companions) multiplied by the prevailing federal per diem rate of reimbursement. See Ex.H attached hereto. Where defendant's credit card records reflect that he paid some cost for meals or incidental expenses during any of those trips, that amount was subtracted from the

17

total amount of travel meals paid by cash. The conservative nature of this figure is evidenced by the fact that it does not include hotels, transportation, entertainment or other miscellaneous expenses normally incurred during personal travel, even though payment for such expenses often was not reflected in defendant's credit card records.

Given the evidence at trial of defendant's extensive personal travel, it is inconceivable that defendant had no expenses associated with those trips. Special Agent Brosas testified that the travel records reflect that from 1995 through 2001, defendant took 37 trips with family members and yet had no credit card charges for <u>any</u> meals or miscellaneous expenses for 32 of those trips. During the same time frame, the travel records reflect that 61 of his trips were to gambling destinations. Documentary evidence and testimony showed that defendant traveled frequently with or to meet female companions. Both Marion Brooks and Martina Jiminez testified that defendant paid for their expenses and, when he paid in their presence, he did so with cash. Considering the evidence of defendant's extensive personal travel with family members, female campions, and to vacation and gambling destinations, and the difficulty tracing cash expenditures for meals and miscellaneous expenses, it is reasonable to use the federal per diem to at least estimate cash expenditures for meals.

### IV. TAX CALCULATION

A.    <u>Applicable Tax Rate</u>

Defendant objects to the application of the 31% tax rate, which was the actual tax rate applicable to him during the tax years at issue. Quoting the 1998 Sentencing Guidelines,

defendant argues that "the tax loss shall be treated as equal to 28% of the under reported income." The Probation Officer pointed out, however, that defendant failed to include the entire quote which states: "If the offense involved filing a tax return in which gross income was under reported, the tax loss shall be treated as equal to 28% of the amount of the unreported gross income (34% if the taxpayer is a corporation) plus 100% of any false credits claimed against taxes, <u>unless a more accurate determination of the tax loss can be made</u>. U.S.S.G. § 2T1.1(c)(1)(A) (1998) (emphasis added). The Probation officer correctly applied the more accurate tax rate based on the actual IRS Tax Rate Schedules applicable to defendant for the tax years at issue.

B.    <u>State Taxes</u>

Defendant also objects to the inclusion of the state tax rate in the calculation of the tax loss. As the Probation Officer pointed out, however, courts have found the amounts of state tax loss to be relevant conduct for sentencing purposes. For example, in <u>United States v. Powell</u>, 124 F.3d 655 (5th Cir. 1997), the district court included in the U.S.S.G. § 2T1.1 "tax loss" the state tax losses arising from the same core criminal conduct for which the defendant was convicted. Recognizing that § 2T1.1 does not speak directly to this situation, the court upheld the district court's calculation and found that it is evident from the text of the Guidelines and their accompanying interpretive commentary that the amount of state taxes evaded may be taken into consideration if they constitute "relevant conduct" as that concept is defined in U.S.S.G. § 1B1.3. <u>Id</u>. at 664.

C.   Unclaimed Deductions

Although defendant did not pay any state taxes on his unreported income, he argues

that he should receive a deduction from the calculation of his federal taxes as if he had paid

the state taxes.  The government agrees with the Probation Officer's thorough analysis of this

issue.   Courts consistently have calculated tax loss based on the magnitude of the false

statements and have refused to credit a defendant with deductions that might have been

available had the taxpayer filed an honest return.  See e.g., United States v. Chavin, 316 F.3d

666 (7th Cir. 2002); United States v. Spencer, 178 F.3d 1365 (10th Cir. 1999); United States

v. Valentino, 19 F.3d 463 (9th Cir. 1994).  See also United States v. Patti, 337 F.3d 1317

(11th Cir. 2003) (finding that defendant should be held accountable for harms caused by both

personal and corporate tax returns, and that the possibility of a lower tax liability had the taxes

been reported properly should not change that result).   Allowing defendant credit for

unclaimed deduction is particularly inappropriate given that there is no evidence to support

such deductions.

**V. DEFENDANT'S ASSERTIONS REGARDING HIS OMITTED INCOME**

The Probation Officer correctly rejected defendant's tortured analysis of omitted

income.  As best the government can discern, defendant would have this Court believe,

without any evidence, that he withdrew cash from his ATM in regular small amounts in 1995

and the first half of 1996, which he inexplicably squirreled away as  a cash hoard for later

years, and that he did not spend a penny of cash other than the few cash expenditures that are

actually documented.  Moreover, as previously discussed, although defendant defended the corrupt payment charges on the claim that he made over $20,000 per year in gambling income from the Friday night poker games, defendant's analysis of income does not contain a penny of gambling income.

Most disturbingly, defendant has now resorted to claiming that he received $20,000 in secret cash payments from his late mother during 1997-1999 in an attempt to create a non-taxable source of cash.  Defendant, of course, did not dare to present this defense at trial.  In support of this new claim, he provided the Court with a typewritten letter dated April 16, 2004, that defendant represents was prepared by his mother, and which states that she has given defendant "thousands of dollars in cash gifts over the ten to fifteen years," although the letter states that she does not know how much.  The letter further states that the cash was secret and that only the two of them knew about the money.  See Ex.I.

There is absolutely no evidence that defendant received $20,000 in secret cash gifts from his mother during 1997 - 1999.  All three siblings were interviewed during the investigation and denied knowledge of any gifts from their mother to defendant.  Defendant has taken a general statement in a letter purportedly from his mother that she gave him thousands of dollars in cash over 10 to 15 years and twisted that into a claim that he received $20,000 in the three tax years of conviction.  Moreover, given that during that time, defendant earned over $160,000 just in reported income each year, it is hard to imagine he would actually take $20,000 from his mother, whose income averaged less than $18,000 from her

pension and social security.  If what defendant claims is true, he took the equivalent of over half of his mother's after-tax income during those years.

## VI. SPECIFIC OFFENSE CHARACTERISTICS

A.    Income from Criminal Activity

The Probation Officer correctly determined that the two point enhancement for unreported income from criminal activity is appropriate.  The enhancement is applicable on three alternative grounds – the proceeds of the campaign account fraud scheme for which defendant was found guilty; defendant's claimed poker income; and corrupt payments (particularly the DeBardelaben payments and particularly under the preponderance of the evidence standard applicable at sentencing).

B.    Sophisticated Concealment

The Probation Officer correctly determined that defendant's offense level should be increased two levels pursuant to U.S.S.G. § 2T1.1(b)(2) because the offense involved sophisticated concealment.  This enhancement appropriately applies because defendant took deliberate and numerous steps over a significant period of time to conceal his tax fraud.

Section 2T1.1(b)(2) instructs that the base offense level shall be increased by two levels if the offense involved sophisticated concealment.  The commentary to the Guidelines defines "sophisticated concealment" as "especially complex or especially intricate offense conduct in which deliberate steps are taken to make the offense, or its extent, difficult to detect." U.S.S.G. § 2T1.1, comment. (n.4) (1998).  Application note 4 provides that "conduct

22

such as hiding assets or transactions, or both, through the use of fictitious entities, corporate

shells or offshore bank accounts ordinarily indicates sophisticated concealment." Id.  The

enhancement is not limited, however, to the examples listed in the commentary.  The

examples are illustrative, not exclusive.  United States v. Clements, 73 F.3d 1330, 1340 (5th

Cir. 1996) (even though defendant's transactions did not involve the use of offshore bank

accounts or fictional entities, his use of multiple cashier's checks and his wife's separate bank

account to obscure link between the money and himself made it more difficult for the IRS to

detect his evasion).  See also United States v. Kontny, 238 F.3d 815, 821 (7th Cir. 2001);

United States v. Lewis, 93 F.3d 1075, 1082 (2d Cir. 1996).  "[T]he essence of the definition

[of sophisticated concealment] is merely 'deliberate steps taken to make the offense ...

difficult to detect.'" Kontny, 238 F.3d at 821.  It includes "conduct that is more complex or

demonstrates greater intricacy or planning than a routine tax-evasion case." United States v.

Barakat, 130 F.3d 1448, 1456 (11th Cir. 1997).[4]  A district court's finding of sophisticated

concealment is reviewed for clear error.  United States v. Paradies, 98 F.3d 1266, 1292 (11th

Cir. 1996); Barakat, 130 F.3d at 1456.

   In this case, defendant's efforts at concealment went well beyond "'the routine tax-

evasion case in which a taxpayer reports false information on his 1040 form to avoid paying

---

   [4]  The November 1, 1998 Amendment to Section 2T1.1(b)(2) resolved a circuit conflict to
provide that, consistent with the usual relevant conduct rules, the enhancement for "sophisticated
concealment" is based on the overall offense conduct for which the defendant is accountable, not
simply the offense of conviction.  U.S.S.G. Supplement to Appendix C, Amendment 577 (1998).
This apparently overrules the Eleventh Circuit's holding in Barakat, 130 F.3d 1448, that only the
offense of conviction may be considered in applying the enhancement.

income taxes.'" United States v. Aragbaye, 234 F.3d 1101, 1108 (9th Cir. 2000) (quoting

Lewis, 93 F.3d at 1082); see also United States v. Jagim, 978 F.2d 1032, 1042 (8th Cir. 1992).

The evidence shows an extensive pattern of defendant's use of cash to conceal his unreported

income.  For example, he routinely used cash to pay bills, such as for electricity, water, gas

and dry cleaning (See e.g., Gov. Exs. 1145, 1146, 1147),  and he used others, such as Dewey

Clark, to deliver those cash payments for him.  He and his wife also used cash to pay some

school tuition.  In addition, defendant insisted that Dewey Clark pay rent for the basement

apartment in cash and defendant did not deposit the cash in his bank accounts.  In fact,

defendant Campbell was very careful not to make cash deposits into his bank account.  Yet,

although he rarely deposited or withdrew cash from his accounts, he frequently paid his

expenses with cash.  United States v. Gricco, 277 F.3d 339, 360-61 (3d Cir. 2002) (evidence

supported finding of sophisticated concealment through currency structuring, use of cash to

avoid reporting requirements, and use of family members' names to hide assets); United

States v. Middlemiss, 217 F.3d 112 (2d Cir. 2000) (scheme effected through stocks listed in

his wife's maiden name and cash payments).  Further, defendant structured payments for

various personal expenditures to be made directly from the campaign account, rather than

through his own bank accounts.  He also concealed income by failing to keep records

concerning any gambling income, material amounts of speech income, and other cash income

and he failed to disclose that income to his accountant and on required City and State financial

disclosure forms.  United States v. Furkin, 119 F.3d 1276, 1285 (7th Cir. 1997) (failing to

24

keep records concerning income and using cash transactions are indicia of sophisticated means). Considered together, defendant's multiple steps of concealment, which lasted over a number of years, strongly support the sophisticated concealment enhancement. See Lewis, 93 F.3d at 1083 (holding that sophisticated means enhancement applied even when "each step in the planned tax evasion was simple, [because] when viewed together, the steps comprised a plan more complex than merely filling out false tax return).

C.     Obstruction of Justice

From the investigative stage, through conviction and presentation to the presentence officer, defendant has treated the justice system with disdain, as if the rules did not apply to him. Following trial, the government learned that during the grand jury investigation, defendant took records from Gabe Pascarella reflecting wins/losses at the Friday night poker games, and cash reimbursements defendant made to Pascarella. Pascarella recently advised the government that prior to Pascarella's first interview with the government, defendant met with Pascarella and discussed possible areas of inquiry by the agents. Defendant and Pascarella discussed how much defendant had won, and defendant suggested that he had won $20,000 to $30,000 per year. Defendant and Pascarella decided to secretly record Pascarella's interview with the agents. During the interview, the agents asked Pascarella about gambling trips, poker games, and money transactions. Immediately following the interview, defendant came to Pascarella's house to talk about the interview. Defendant and Pascarella discussed the types of records that Pascarella had, and Pascarella showed Campbell the records that

included poker game settlement records reflecting wins and losses for many of the weekly games played at Pascarella's home, dedicated credit card records with handwritten notations about defendant's traveling companions, cashier's checks made in payment of the dedicated credit card bills, and Supersonic travel records. Pascarella advises that defendant wanted to take all of the records, but Pascarella objected. Defendant did take some of the records, including weekly poker settlement sheets. Defendant told Pascarella not to worry about it, and Pascarella never saw the records again. See Pascarella affidavit at J. The records were never produced in reciprocal discovery or the sentencing process.

Defendant's obstruction continued at trial when he advanced a poker earning defense that he now disavows. After presenting one "truth" to the jury, defendant now denies that "truth" and asserts a new "truth" to explain his cash--secret cash gifts from his late mother. In his submission to the Probation Officer, defendant has made numerous false assertions concerning the Dewey Clark rent, his charitable contribution deductions, Labovitz's role in determinate of his personal expenses, etc. Defendant's stories have varied depending on the convenience of the moment. There may be other bases for obstruction. He must now face the consequences of distorting the truth and should be held accountable for his obstruction of justice. If the Court finds that multiple acts of obstruction have occurred, the Court should consider an upward departure.

Defendant's obstruction of this case is consistent with his perjury in other areas of his life. For example, prior to the trial in this case, the Florida Board of Bar Examiners filed an

"Allegation of Material Misstatement and/or Material Omission" against defendant based upon defendant's application to the Florida Bar and testimony before the Board that was "false, misleading, or lacking in candor" concerning the status of the federal grand jury investigation. (Documents concerning the Florida Bar action are available for the Court). The proceedings on this matter were continued at defendant's request until the conclusion of this criminal case.

Likewise, although defendant cross examined Dan DeBardelaben at length trying to create the false impression that DeBardelaben had made a false statement on a mortgage application regarding his employment, it was actually defendant who had presented false information, also under oath, in his Florida home loan application. Defendant repeatedly swore that no portion of his down payment was borrowed, when, in truth, he had borrowed $40,000 from Steve Labovitz for his home purchase. See Ex. K.

D.    Abuse of a Position of Trust

Defendant should receive a two point enhancement for abuse of a position of trust. Under United States v. Barakat, 130 F. 3d 1448 (11th Cir. 1997), the enhancement for an abuse of a position of trust is appropriate when the defendant's position of trust "significantly facilitate(s) the commission or concealment of the offenses." Id. 1455. In this case, defendant used his position as Mayor of the City of Atlanta not only to obtain some of the unreported income, but also to facilitate and conceal the crime of conviction – under reporting his income. Defendant abused his position as Mayor by using employees of the City of Atlanta

to facilitate and conceal his under reporting of income. Defendant used City employees to communicate false information to his accountant and he used City employees to prepare financial disclosure forms that concealed unreported speech income. Defendant used Eunice Lockhart Moss, his City scheduler; Glenda Minkin, his City Communications Director; and Serena Skaggs, his City secretary, to communicate false income information to defendant's accountant, Thomas Ziff. Moreover, if Ms. Lockhart Moss' testimony is credited, defendant used Ms. Lockhart Moss to solicit and negotiate his speech fees and to make arrangement for the payments, some of which defendant did not report. Defendant also used Ms. Lockhart Moss to "double dip" and seek reimbursement from his campaign account for travel expenses covered by third parties. Defendant also used Ms. Minkin to communicate with Mr. Ziff concerning defendant's income. When interviewed, Mr. Ziff reported that Ms. Minkin told him that defendant did not have any gambling income. Ms. Minkin testified that defendant told Ms. Minkin that he "broke even" in gambling and that he did not have any additional income to report. Defendant also used another City employee, Dewey Clark, to facilitate and conceal his unreported income by instructing Clark to pay numerous personal bills of defendant's with cash provided by defendant that defendant did not report on his tax returns. By using Mr. Clark, his "Special Assistant," to pay defendant's bills in cash rather than depositing the cash into his bank account or advising his accountant of the income, defendant facilitated both the commission of the tax fraud offense - under reporting his income - and the concealment of that offense by avoiding a paper trail of his receipt of cash. This use of City

employees for personal and illegal purposes also supports an upward departure pursuant to § 5K2.7 for disruption of government function.

Defendant abused his position of trust with respect to the personal use of campaign funds. Defendant abused his position, and individuals working with his campaign, including Steve Labovitz and Teresa Griffith, to facilitate and conceal defendant's tax fraud. More specifically, defendant abused his position of trust with his campaign donors to use for personal purposes funds contributed by the donors to retire campaign debt. Defendant paid his personal bills directly from the campaign account, concealing the income, and used Mr. Labovitz and Ms. Griffith to process those payments.

## VII. CONCLUSION

Appropriately applying standards of law governing sentencings, the Probation Officer has calculated a guideline range that is supported by the evidence. The tax loss is soundly supported by defendant's own cash expenditures, his statements and argument regarding gambling income and the evidence of his receipt of corrupt payments. The government agrees with the Probation Officer that defendant's sentence should be enhanced for his failure to report criminally derived income exceeding $10,000, sophisticated concealment and obstruction. Additionally, significant grounds exist to further enhance defendant's sentence for his abuse of a position of trust.

In light of the § 3553(a) factors bearing on deterrence and promoting respect for the law, the government respectfully requests this Court to sentence defendant to a term of

imprisonment that reflects the seriousness of a high-level public official concealing criminally derived income, abusing City employees, cheating on his taxes and defrauding his campaign contributors. The sentence should also reflect defendant's pattern of obstructing justice through multiple falsities and manipulation. The Court's sentence should speak clearly and without equivocation such that defendant's continuing protestations and refusal to accept responsibility will not diminish the jury's verdict of guilt.

Respectfully submitted,

DAVID E. NAHMIAS
United States Attorney


/s/Sally Quillian Yates
SALLY QUILLIAN YATES
First Assistant United States Attorney
Georgia Bar. No. 591250


/s/Phyllis B. Sumner
PHYLLIS B. SUMNER
Assistant United States Attorney
Georgia Bar No. 692165


/s/Russell G. Vineyard
RUSSELL G. VINEYARD
Assistant United States Attorney
Georgia Bar. No. 727890

600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
(404) 581-6073
(404) 581-6181 (Fax)

30

## CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the persons listed below a copy of the foregoing document by facsimile, minus the exhibits. (The exhibits will be ready for pick up Monday morning).

> William R. Martin, Esq. and
> Kerry L. Verdi, Esq.
> Blank, Rome, LLP
> 600 New Hampshire Avenue, N.W.
> Washington, D. C. 20037
>
> Jerome J. Froelich, Esq.
> McKenney & Froelich
> Two Midtown Plaza, Suite 1250
> 1349 West Peachtree Street
> Atlanta, Georgia 30309-2920
>
> W. Fred Orr, II, Esq.
> Orr and Edwards
> 710 One West Court Square
> Decatur, Georgia 30030

This 9th day of June, 2006.

_____

SALLY QUILLIAN YATES
FIRST ASSISTANT UNITED STATES ATTORNEY